***********
The Full Commission has reviewed the Deputy Commissioner's Opinion and Award based on the record of the proceedings before the Deputy Commissioner and the briefs and oral arguments before the Full Commission. The appealing party has shown good grounds to reconsider the evidence and having reviewed the competent evidence of record, the Full Commission hereby MODIFIES the Opinion and Award of the Deputy Commissioner.
 ***********
The Full Commission finds as additional fact and concludes as additional matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. All parties are properly before the Industrial Commission and the Industrial Commission has jurisdiction over the parties and this claim. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. At all relevant times herein the employer-employee relationship existed between defendant-employer and plaintiff.
3. Gallagher Basset Services, Inc. was the workers' compensation administrator on the claim at all relevant times herein. Defendant is an approved self-insured.
4. On January 29, 2001 plaintiff sustained a compensable injury by accident to his right knee when he slipped off a pallet. Defendant accepted liability for plaintiff's compensable right knee injury by filing a Form 60 on March 30, 2001.
5. Plaintiff's average weekly wages will be determined from the facts of this claim.
6. At the hearing before the Deputy Commissioner, the parties entered the following exhibits into the evidence of record:
 a) Stipulated Exhibit #1: Pre-trial Agreement, packet of medical records, Industrial Commission forms and various documents
b) Stipulated Exhibit #2: plaintiff's payroll records
 c) Defendant's Exhibit # 1: plaintiff's payroll history
7. The issues to be determined by the Commission are as follows:
 a) Whether plaintiff currently suffers from any psychiatric or psychological disabilities that are causally related to his compensable injury;
b) What is plaintiff's appropriate compensation rate;
 c) Whether the position performed by plaintiff was suitable employment within the meaning of the Workers' Compensation Act;
 d) Whether defendant complied with the North Carolina Industrial Commission Order of October 17, 2002;
 e) Whether defendant is entitled to a credit for overpayment of disability compensation;
 f) Whether plaintiff's refusal to comply with recommended medical treatment justifies termination of his compensation pursuant to N.C. Gen. Stat. § 97-27 or bars his prosecution of this action.
 ***********
Based upon the competent and credible evidence, the Full Commission finds as fact and concludes as a matter of law the following:
 FINDINGS OF FACTS
1. At the hearing before the Deputy Commissioner, plaintiff was forty-eight years old. At the time of his admittedly compensable injury by accident, plaintiff had worked for defendant for twenty-two years. Plaintiff worked as a stock room attendant, which was a receiving clerk, a position he held for fourteen years prior to January 29, 2001.
2. On January 29, 2001, plaintiff sustained an injury by accident arising out of and in the course of his employment with defendant when he stepped off a pallet and misplaced his foot, causing his ankle to roll and his knee to buckle, which caused him to fall. As a result of the compensable injury by accident, plaintiff sustained a severe injury to his right ankle and knee, specifically a right medial meniscus tear and grade three to four cartilage injury.
3. This claim was accepted as compensable pursuant to a Form 60, Employer's Admission of Employer's Right to Compensation, wherein the carrier agreed to make temporary total disability payments based on the average weekly wage of $533.20, which yields a weekly compensation rate of $355.48. On April 10, 2001, defendant filed an amended Form 60 listing an average weekly wage for plaintiff of $1,097.40, which yields the maximum compensation rate for 2001 of $620.00 per week.
4. Plaintiff was initially treated by Dr. Robert Wainer, an orthopaedic surgeon. On March 16, 2001, Dr. Wainer performed knee surgery on plaintiff. Thereafter, plaintiff's condition deteriorated and he was subsequently diagnosed by Dr. Wainer as having developed reflex sympathetic dystrophy (RSD). Dr. Wainer referred plaintiff to Dr. Lewis A. Koman at North Carollina Baptist Hospital for treatment of his RSD.
5. Plaintiff underwent several diagnostic exams to determine the extent of his complex regional pain syndrome (CRPS), also referred to as RSD. On July 23, 2001, plaintiff had a bone scan performed on his right leg and Dr. Koman reported the results as abnormal and consistent with autonomic dysfunction related to CRPS. Dr. Koman also performed a stimulus test on plaintiff and found that plaintiff had an abnormal pain reaction, specifically a hyperpathia allodynia, which is a painful response to a normally non-painful stimulus. Finally, Dr. Koman performed a cold-stress test on plaintiff's right leg, which also yielded abnormal results and was consistent with the bone scan and plaintiff's clinical presentations of CRPS.
6. On July 25, 2001, plaintiff saw Dr. Koman who diagnosed plaintiff as suffering from severe arthrofibrosis, or scar tissue in the knee joint, and CRPS in the right leg, secondary to the admittedly compensable knee injury of January 29, 2001.
7. Dr. Koman felt that plaintiff's original diagnosis was an injury to the right knee, with a medial meniscus tear and lateral meniscus tear and grade three to four cartilage injury. Dr. Koman testified that CRPS resulted from and was complicating the original compensable knee injury of January 29, 2001. Dr. Koman testified that the CRPS probably resulted from an acute injury to the infrapatellar branch of the saphenous nerve under plaintiff's right kneecap.
8. Dr. Koman defined CRPS or RSD as a syndrome that includes pain which is usually out of proportion to the injury and includes autonomic dysfunction and functional impairment.
9. At plaintiff's July 25, 2001 appointment with Dr. Koman, plaintiff had a very limited range of motion in his right leg and difficulty standing on the leg. Based on this exam and the diagnostic testing, Dr. Koman recommended that plaintiff be admitted to North Carolina Baptist Hospital for continuous epidural treatment for his pain and for a repeat arthroscopy on his knee. On September 5, 2001, plaintiff was admitted to the hospital for this treatment and evaluation of his right knee under anesthesia.
10. On August 9, 2001, Dr. Koman noted that the study he performed on plaintiff's lower extremities, in conjunction with other instruments and studies, was abnormal and consistent with but not diagnostic for CRPS.
11. On August 20, 2001, plaintiff was seen by Dr. George W. Plonk, Jr. who found no evidence of arterial or venous problems in his foot.
12. In his September 5, 2001 appointment with Dr. Koman, plaintiff had significant debilitating, chronic pain. Dr. Koman scheduled plaintiff for surgery with Dr. Gary Poehling, Chairman of the Orthopaedic Department at Wake Forest University Hospital.
13. On October 31, 2001, plaintiff underwent a repeat arthroscopy performed by Dr. Poehling. The second arthroscopy revealed very severe arthrofibrosis in plaintiff's right knee joint, which Dr. Koman felt was directly related in part to the severity of plaintiff's injury.
14. Although the arthroscopy of October 31, 2001, restored some range of motion to plaintiff's leg, plaintiff continued to experience severe and disabling symptoms of CRPS, which continued to worsen. Plaintiff did not regain functional use of his right leg and remained on crutches.
15. On November 16, 2001, plaintiff was referred by Dr. Koman to physical and water therapy. Plaintiff was given an out of work note for eight weeks by Dr. Koman.
16. On December 7, 2001, plaintiff saw Dr. Koman for continued hypersensitivity and although plaintiff's skin had healed, his right leg remained red and discolored. Dr. Koman recommended plaintiff try a spinal cord stimulator.
17. On January 16, 2002, Dr. Koman found plaintiff unable to work and referred him for pain management.
18. On January 21, 2002, Dr. Koman released plaintiff to sedentary work and restricted to sitting. Plaintiff was allowed to work half days for two weeks, for six hours in the third week, and full time in the fourth week.
19. Plaintiff returned to work with defendant on January 26, 2002 in a created shipping clerk position. This position normally required a worker to load trucks, attach labels and complete paperwork. However, in order to adhere to plaintiff's restrictions, plaintiff was only required to complete paperwork. The Full Commission finds based upon the greater weight of the credible evidence that defendant created a position for plaintiff that involved only approximately one-third of the normal duties or workload. The position created for plaintiff was not one that would normally be available with defendant or with other employers in the local, regional or national economy.
20. On February 20, 2002, Dr. Koman restricted plaintiff to no walking and no standing, with his other restrictions remaining the same. Dr. Koman found plaintiff's physical conditions unchanged, with his pain increased. Dr. Koman felt plaintiff's prognosis was poor and recommended physical therapy. On the days plaintiff attended physical therapy, plaintiff was restricted to working five hours a day.
21. Dr. Koman continued to treat plaintiff during March 2002 and on April 24, 2002, Dr. Koman found that plaintiff needed additional sympathetic block injections and referred plaintiff to a psychologist.
22. On May 24, 2002 plaintiff was first examined by Dr. Timothy Webster, a psychologist. Dr. Webster initially evaluated plaintiff to determine whether or not plaintiff was a candidate for a spinal cord stimulator.
23. Dr. Webster diagnosed plaintiff with major depression secondary to chronic pain and situational stressors Axis I. Dr. Webster found plaintiff to have no significant psychiatric history and found plaintiff to be credible based upon the testing he administered.
24. On July 10, 2002, Dr. Koman noted that he did not feel plaintiff needed to remain sedentary, but felt plaintiff really needed a job that would accommodate his continued use of crutches. Plaintiff was released to drive an automatic car and was restricted from using a fork lift. Dr. Koman did not feel plaintiff needed additional therapy, but felt plaintiff's continuing symptoms of pain needed to be addressed.
25. On August 8, 2002, plaintiff was seen by Dr. Henry E. Branham, a psychiatrist, for a psychiatric evaluation. Dr. Branham diagnosed plaintiff with major depression, single episode, non-psychotic, secondary to chronic pain syndrome and RSD.
26. On September 25, 2002, Dr. Koman recorded a 40 pound unplanned weight loss for plaintiff. Dr. Koman felt plaintiff continued to demonstrate a willingness to work in spite of his condition. Dr. Koman believed that plaintiff's prognosis for a complete recovery was significantly guarded. Dr. Koman recommended a cold stress test, which was denied by the carrier. Dr. Koman released plaintiff to light duty work and recommended the trial of a spinal cord stimulator.
27. A spinal cord stimulator was surgically installed by Dr. Stuart Meloy of Piedmont Pain Management in December 2002. The trial of the spinal cord stimulator was not successful and plaintiff was left with severe back pain at the site of the insertion of the device into his spinal cord.
28. Defendant denied plaintiff any further psychological treatment and plaintiff received no psychological care until after plaintiff was seen by Dr. Branham on January 24, 2003. Rehabilitation nurse Jean Bassett referred plaintiff to Dr. Branham for medication monitoring. Dr. Branham evaluated plaintiff and found plaintiff to be so profoundly depressed and suicidal that Dr. Branham wrote plaintiff out of work indefinitely. After receiving Dr. Branham's report, Ms. Bassett referred plaintiff to Dr. Webster for psychological counseling because plaintiff had developed suicidal thoughts related to his injury.
29. Dr. Webster saw plaintiff on January 31, 2003, at which time he found plaintiff's depression was considerably worse and plaintiff was having suicidal thoughts. Dr. Webster attributed plaintiff's condition to social isolation, financial strain, and perceived harassment at work. Dr. Webster found plaintiff's depression on January 31, 2003 to be disabling.
30. On February 20, 2003, plaintiff was given a functional capacity evaluation and found to be capable of sedentary work for eight hours a day.
31. Dr. Koman last saw plaintiff on February 26, 2003, at which time Dr. Koman assigned a 100% permanent partial impairment rating to plaintiff's right leg. Dr. Koman also placed plaintiff on permanent restrictions that included sedentary work only, lifting ten pounds maximum, limited walking and standing with crutches only. Dr. Koman attributed the rating and restrictions to the limitation of motion in plaintiff's knee, the swelling, the previous surgeries, the decreased function, and plaintiff's inability to walk. Dr. Koman causally related the rating and restrictions to plaintiff's compensable injury of January 29, 2001. On February 23, 2003, Dr. Koman released plaintiff to further care with pain management professionals and continued psychological/psychiatric treatment.
32. Plaintiff was seen by Dr. Branham on February 27, 2003, at which time Dr. Braham found plaintiff unable to work. Dr. Branham felt plaintiff's diagnosis had changed to post-traumatic stress disorder and marked concentration impact and felt plaintiff needed continuing psychotherapy.
33. Plaintiff was again seen by Dr. Branham on March 20, 2003, April 16, 2003 and May 28, 2003. Dr. Branham continued to feel that plaintiff was unable to work and continued to keep plaintiff out of work.
34. On March 25, 2003, at the request of defendant, plaintiff attended an independent medical examination with neuropsychologist Dr. C. Thomas Gualtieri, who diagnosed plaintiff with depression which he felt was directly related to chronic pain and disability. Dr. Gualtieri also found that plaintiff was disabled from any employment.
35. Dr. Webster saw plaintiff on May 1, 2003 and felt he was not at maximum medical improvement as to his psychological conditions. Dr. Webster stated that once plaintiff's depression improved, he would be able to return to work in some capacity.
36. In his May 20, 2003 deposition, Dr. Koman felt that plaintiff's prognosis for further recovery was very guarded or poor. He also felt that the CRPS could last for the rest of plaintiff's life, and that the stiffness and the arthrofibrosis in plaintiff's knee will persist for the remainder of his life. Dr. Koman never evaluated or discussed with plaintiff's his job with defendant and therefore would not express an opinion on whether the position was suitable employment for plaintiff. Dr. Koman testified that throughout his treatment plaintiff had always had pain when he put weight on his right leg.
37. Dr. Webster found plaintiff's depression was disabling and secondary to his chronic pain and highly disrupted life situation coming from his injury, loss of occupational status and income, and adverse social impact.
38. Dr. Webster also agreed with Dr. Branham's decision to take plaintiff out of work in January of 2003, and testified that he would defer to Dr. Branham on the issue of plaintiff's ability to return to work.
39. The opinions and conclusions by Dr. Branham, Dr. Gualtieri, and Dr. Webster regarding the diagnosis and the treatment of plaintiff's depression were all consistent.
40. As the result of the compensable injury by accident, plaintiff was totally disabled and unable to work in any employment from March 18, 2001 until he returned to work on January 26, 2002. Upon his return to work, plaintiff earned diminished wages and was paid temporary partial disability benefits from January 26, 2002 through June 30, 2002, in varying amounts equal to two-thirds of the difference between plaintiff's average weekly wage of $1,097.40 and his actual earnings.
41. On or about June 30, 2002, defendant unilaterally and without explanation decided to terminate plaintiff's temporary partial disability benefits. Defendant did not seek or receive Commission approval before terminating plainitff's benefits.
42. As a result of the termination of plaintiff's benefits, plaintiff suffered financial hardship. The decrease in plaintiff's income forced plaintiff to move in with his brother and to incur significant amounts of debt, which plaintiff still had at the time of the hearing before the Deputy Commissioner. Plaintiff sought the advice of a credit counseling service, with which he had consolidated his debts. Plaintiff's financial problems after April 2002 were the direct result of defendant's decision to terminate plaintiff's temporary partial disability benefits without approval of the Commission. Plaintiff's financial problems compounded and aggravated plaintiff's depression resulting from the pain and disability of his compensable knee injury of January 29, 2001.
43. From the period of April 28, 2002 through the date of the hearing before the Deputy Commissioner, plaintiff received only three temporary partial disability payments, requiring plaintiff's counsel to request an order from the Commission requiring defendant to make regular payments.
44. On October 17, 2002, the Commission issued an Order requiring defendant to pay plaintiff temporary partial disability, subject to a 10% penalty for all payments more than 14 days past due. Defendant did not timely file an appeal of this Order.
45. At the time of the hearing before Deputy Commissioner Glenn, defendant had not made any additional temporary partial disability payments to plaintiff and failed to comply with the Commission's Order of October 17, 2002.
46. On January 24, 2003, plaintiff was taken out of work by Dr. Branham until further notice. Plaintiff has remained out of work since that date under Dr. Branham's orders and has since been receiving temporary total disability payments in the amount of $620.00 per week. By resumption of payment of disability compensation when plaintiff was taken out of work for his psychological conditions, defendant admitted the compensability of plaintiff's depression and other psychological conditions and is estopped to now deny that these conditions are causally related to the compensable injury by accident.
47. Plaintiff has not reached maximum medical improvement of his depression and since January 24, 2003 has continued to be unable to work due to his disabling depression and the physical pain and disability caused by his admittedly compensable injury of January 29, 2001.
48. The Full Commission finds based on the greater weight of the credible evidence that plaintiff's depression and other psychological conditions are the proximate result of the pain associated with plaintiff's compensable knee injury of January 29, 2001. The Commission further finds that plaintiff's back condition resulted from the implantation of the spinal cord stimulator and was a natural and probable result of the compensable injury by accident and resulting pain.
 *********** CONCLUSIONS OF LAW
1. On January 29, 2001, plaintiff sustained an injury by accident to his right ankle and knee arising out of and as a result of this compensable injury by accident. N.C. Gen. Stat. § 97-2(6). As the natural and probable result of the admittedly compensable ankle and knee injury, plaintiff now suffers from severe and disabling CRPS, arthrofibrosis in his right knee, back pain, depression, anxiety, and post-traumatic stress disorder.
2. As a result of this admittedly compensable injury by accident and resulting pain, plaintiff was unable to earn wages in any employment from March 18, 2001 until he returned to work on January 26, 2002, and from January 24, 2003 and continuing until further Order of the Commission. Plaintiff is therefore entitled to temporary total disability compensation at the maximum compensation rate for 2001 of $620.00 per week for the periods from March 18, 2001 through January 25, 2002 and from January 24, 2003 and continuing until further Order of the Commission. N.C. Gen. Stat. § 97-29.
3. As a result of the admittedly compensable injury by accident, plaintiff was unable to earn the same or greater wages from January 26, 2002 through January 23, 2003 and is entitled to temporary partial disability benefits from January 26, 2002, through January 23, 2003 at the rate of two-thirds of the difference between his pre-injury wages and the wages he was able to earn during this period. N.C. Gen. Stat. § 97-30. Defendant has already paid partial compensation for the period January 26, 2002 through June 30, 2002, when defendant terminated plaintiff's benefits.
4. Plaintiff is entitled to payment by defendant of medical expenses incurred and to be incurred by plaintiff as a result of his compensable injury by accident, including but not limited to treatment that has been recommended by Drs. Wainer, Koman, Poehling, Branham, Gaultier, Webster, Martin and Meloy that is reasonably necessary to effect a cure, provide relief and lessen plaintiff's period of disability. N.C. Gen. Stat. §97-25.
5. In that plaintiff has not yet reached maximum medical improvement with regard to his psychiatric/psychological conditions and back injuries, defendant is not entitled to initiate vocational rehabilitation services until plaintiff is released by his treating physicians to return to work or participate in vocational rehabilitation services. N.C. Gen. Stat. § 97-25.
6. The shipping clerk position offered to plaintiff in January 2002 was not suitable employment. N.C. Gen. Stat. §§ 97-32, 97-32.1; Rule III(G) of the North Carolina Industrial Commission Rules for Utilization of Rehabilitation Professionals.
7. Defendant's refusal to comply with the Commission's Order of October 17, 2002 to reinstate temporary partial disability compensation and defendant's denial of psychological treatment were made without any reasonable basis. Therefore, because of defendant's unfounded litigiousness plaintiff is entitled to an attorney's fee award of 25% of the past due temporary partial disability compensation which shall be paid to plaintiff's attorney in addition to the compensation owed plaintiff and not deducted from the amount due plaintiff. N.C. Gen. Stat. § 97-88.1.
8. Defendant shall pay to plaintiff a late payment penalty of 10% on all past due temporary partial or total disability compensation. N.C. Gen. Stat. § 97-18(g).
9. Defendant shall pay to the Industrial Commission $1,000.00 as a sanction for failure to comply with the Workers' Compensation Rules by unilaterally stopping plaintiff's temporary partial disability compensation without Commission approval. N.C. Gen. Stat. § 97-18.1(b); Rule 802 of the North Carolina Workers' Compensation Rules.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendant shall pay plaintiff temporary total disability compensation at the rate of $620.00 per week for the periods from March 18, 2001 through January 25, 2002 and from January 24, 2003 and continuing until further Order of the Commission.
2. Defendant shall pay plaintiff temporary partial disability compensation at the rate of two-thirds of the difference between his average weekly wages before the injury and the average weekly wages he was able to earn during the period January 26, 2002 until January 23, 2003.
3. Any past due compensation is subject to a 10% late penalty pursuant to N.C. Gen. Stat. § 97-18(g).
4. Defendant shall be allowed a credit for temporary total and temporary partial disability compensation that has already been paid to plaintiff through the date of this Award.
5. Defendant shall pay all medical expenses incurred by plaintiff for treatment of his January 29, 2001 injuries up through and including the date of this Award, and defendant shall pay for plaintiff's future medical treatment with Drs. Wainer, Koman, Poehling, Webster, Branham, Meloy, and Martin, including but not limited to Drs. Wainer, Koman and Poehling's treatment of plaintiff's knee injury, Drs. Webster and Branham's treatment of his psychological injuries, and the medications and therapy recommended by all of the above listed physicians, including the treatment of plaintiff's low back injury by Dr. Meloy.
6. Drs. Wainer, Koman, Poehling, Webster, Branham, Meloy, and Martin shall continue in their capacity as plaintiff's treating physicians.
7. Based upon defendant's stubborn, unfounded ligitiousness, defendant shall pay an attorney's fee of 25% of all past due temporary partial disability compensation directly to plaintiff's attorney. The attorney's fee shall not be deducted from the amount paid to plaintiff.
8. Defendant shall pay to the Industrial Commission a sanction of $1,000.00 for failure to comply with the Workers' Compensation Rules by unilaterally stopping plaintiff's temporary partial disability compensation without Commission approval.
9. As he has not yet reached maximum medical improvement, plaintiff is not ordered to cooperate with vocational rehabilitation at this time.
10. A reasonable attorney fee of 25% of all compensation payable to plaintiff shall be paid by defendant to plaintiff's counsel.
8. Defendant shall pay the costs of this action.
This the 27th day of September, 2004.
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
 S/____________ BUCK LATTIMORE CHAIRMAN
 S/_____________ PAMELA T. YOUNG COMMISSIONER